# EXHIBIT 3

# HELLER, HURON, CHERTKOF, LERNER, SIMON & SALZMAN

P.L.L.C.

ATTORNEYS AT LAW

1730 M STREET, N.W. • SUITE 412
WASHINGTON, DC 20036-4517

(202) 293-8090
FAX: (202) 293-7110
E-MAIL: info@hellerhuron.com



June 15, 2005

Shawniqua Ottley
Human Resources Manager
D.C. Department of Parks and Recreation
3149 16th Street, N.W.
Washington, D.C. 20010

Dear Ms. Ottley:

Enclosed is a Preliminary Report of Investigation in Garrina Byrd's complaint against Darnell Thompson.

While the Report is fairly thorough, a few outstanding matters remain to be completed. As noted in the Report, I have not been able to interview several of the other women who made complaints of sexual harassment against Mr. Thompson. Despite their assurances that they are willing to talk with me, it has not been possible to confirm a date and time for their interviews. In addition, I have not scheduled a follow-up interview with Ms. Byrd. I recommend that this interview be scheduled in order to have Ms. Byrd respond to Mr. Thompson's testimony and to clear up a few questions about her own testimony. Finally, I am waiting for the production of both Joyce Roberts' and Mr. Thompson's interview transcripts.

Where they are available, the Report of Investigation cites witnesses' transcripts to support their statements. The cites are "TR page number." After Mr. Thompson's and Ms. Roberts' transcripts are produced, I will insert appropriate transcript pages. I will also send over all of the transcripts as exhibits to the Final Report of Investigation.

Please let me know if you have any questions about the Report, my recommendations, or the follow-up work that remains to be completed. Thank you.

Sincerely,

Carolyn N. Lerner

cc:    Kimberley Amprey Flowers
       Director

       Don Fishman
       General Counsel

GB 00017

# PRELIMINARY REPORT OF INVESTIGATION

In the Complaint of

**Garrina Byrd v. Darnell Thompson**

**Prepared by:**

**Carolyn Lerner**
**Heller, Huron, Chertkof,**
**Lerner, Simon & Salzman**

**June 15, 2005**

GB 00018



## I.    Background of Investigation

On April 6, 2005, Garrina Byrd filed a complaint of sexual harassment with the D.C. Office of Human Rights. Shortly before contacting the Office of Human Rights, Byrd told Julie Banks that she had been sexually harassed by her supervisor, Darnell Thompson. Banks is the Maintenance Supervisor for the Facilities Maintenance Division located at 1515 Half Street, S.W., and Thompson is the Chief of that Division. Banks directed Byrd to Human Resources, where Byrd informed Arnita Bonner, who was then the Human Resources Manager, that Thompson had sexually harassed her.

Because there had been previous complaints against Thompson, and because of the seriousness of Byrd's allegations, an independent investigation was commenced.

The following is a summary of the investigation to date. However, because several potentially important witnesses have not been interviewed yet, and a follow-up interview with Byrd should still be scheduled, I recommend that the investigation remain open. In addition, several of the interview transcripts are not yet available. Accordingly, I will plan to prepare a supplemental report upon receipt of the other transcripts.

## II.    Parties

**Garrina Byrd** is a Clerical Assistant who has been employed by the Department of Parks and Recreation since 2001. She was initially employed through Project Empowerment, a "welfare to work" program, and was then hired on a contract basis by the Department. She remains a contract employee at present.

**Darnell Thompson** is the Chief of the Facilities Maintenance Division and has been in that position since 1999. Until Thompson was put on administrative leave following Byrd's complaint, he was her direct supervisor.

## III.    Witnesses Interviewed

In addition to the complainant, Garrina Byrd, and the respondent, Darnell Thompson, the following witnesses have been interviewed:

**Julie Banks**, Maintenance Supervisor at the 1515 Half Street location. Banks is Byrd's current supervisor and worked closely with Mr. Thompson.

**Stanley Dickson**, Acting Foreman for the electric shop, the plumbing shop and the HVAC shop at the 1515 Half Street location. Dickson was identified a potential witness who might have information about Mr. Thompson's relationship with Ms. Byrd, as well as other complaints of sexual harassment against Mr. Thompson.

GB 00019

2



**Leon Harris,** Landscape Sanitation Supervisor at the 1515 Half Street location. Mr. Harris was identified as a potential witness who might have information about Mr. Thompson's relationship with Ms. Byrd, as well as other complaints of sexual harassment against Mr. Thompson.

**Sylvia Gwathmey,** Site Manager for Takoma Community Center and former Chief Shop Steward. Ms. Gwathmey was interviewed because of her potential knowledge of sexual harassment complaints against Mr. Thompson.

**Deborah Jackson,** Union President. Ms. Jackson was interviewed because of her potential knowledge of other sexual harassment complaints against Mr. Thompson.

**Johnnie Richardson,** Crew Leader in the Maintenance Division at the 1515 Half Street location. Ms. Richardson was interviewed because of her potential knowledge of Mr. Thompson's relationship with Ms. Byrd and other female employees.

**James Gripper,** Crew Leader in the Maintenance Division at the 1515 Half Street location. Mr. Gripper was interviewed because of his potential knowledge of Mr. Thompson's relationship with Ms. Byrd and other female employees.

**Steven Scott,** Plumber at the 1515 Half Street location. Mr. Scott was interviewed because of his potential knowledge of Mr. Thompson's relationship with Ms. Byrd and other female employees.

**Marlo Chaney,** a former summer employee at the Department of Parks and Recreation, and personal friend of Ms. Byrd's. Chaney was interviewed because of her potential knowledge of Mr. Thompson's relationship with Ms. Byrd, as well as her own experience with Mr. Thompson.

**Joyce Roberts** was Garrina Byrd's former supervisor and still works at the 1515 Half Street location. She was interviewed because of her potential knowledge of Mr. Thompson's relationship with Ms. Byrd.

## IV.    Witnesses To Be Interviewed

The following witnesses have all expressed a willingness to be interviewed in this investigation, but to date have not been available for interviews.

**Tonya Kemper** is a former D.C. Parks and Recreation employee who complained about sexual harassment from Mr. Thompson.

**Annette Burns** is a former D.C. Parks and Recreation employee who complained about sexual harassment from Mr. Thompson.

**Demara Gaskins** is a former D.C. Parks and Recreation employee who complained about sexual harassment from Mr. Thompson.

GB 00020

3

**Katrina Williams** is a former D.C. Parks and Recreation employee who complained about sexual harassment from Mr. Thompson.

## V.    Summary of Investigation

### A.    Byrd's Testimony

Garnetta Byrd was interviewed on May 23, 2005. Her lawyer, Gary Brown, was present at the interview.

Byrd testified that Thompson began harassing her virtually the first time that she had contact with him in 2001. Byrd began working at the Department through Project Empowerment as a Maintenance Worker. In this position, Byrd was required to work in the field at different Parks and Recreation centers. According to Byrd, after about a year in this position, she had a "confrontation" with someone that she knew in her personal life. Byrd was then told by the person who drove the truck to which she was assigned that he did not want her on his truck anymore.

According to Byrd, when she met with Thompson about the confrontation he told Byrd to lift her shirt up so that he could see her breasts. Tr. 7. Thompson allegedly asked Byrd "Do you want to work? As if to say, you, if you don't want to do that then you don't want to work." Tr. 9. Because Byrd wanted to keep her job, she lifted her shirt and showed him her breasts.

After this initial incident with Thompson, Byrd began working in the office at 1515 Half Street, S.W. Byrd was assigned to work on the second floor next to Thompson's office performing clerical duties. According to Byrd, Thompson made daily comments about her body, or "things about my breasts. And as time went on he started being more aggressive." Tr. 10.

> When I first started his secretary, she asked me if I would, you know, take his coffee to him in the morning, and I would make his coffee and take his coffee to him in his office. When I would bring him his coffee he would say things like, "Did you put some breast milk in it," or just a whole lot of sexual comments. And then back to -- he started back again asking me to, if I would lift my shirt up.

Tr. 11

GB 00021

4





Byrd contends that a month or two after starting in the office, she told Joyce Roberts -- Thompson's secretary and Byrd's direct supervisor -- about Thompson's behavior.

> It was like as he reached out to touch my breasts I kind of like pushed his hand away. And he was like, "I don't get no breast with my coffee this morning." It was kind of like a -- he would say it like he was saying he wanted a muffin and coffee in the morning. "I can't have my breasts and my coffee?" And I was like -- I kind of was scared to say something to him, so that's why I said something to Ms. Roberts, because he told me she was my supervisor.

Tr. 12.

Approximately two years ago, around the time that Byrd's 13-month appointment was close to expiring, Thompson "became very aggressive with the harassment." Tr. 25. According to Byrd, Thompson began calling Byrd on her cell phone at night and was requiring her to sit in his office all day. Around this time, Thompson started asking Byrd for sex. According to Byrd, "Mr. Thompson point blankly (sic) told me if I didn't want to have sex with him I wouldn't be able to work there anymore." Tr. 25. Because Byrd was afraid to lose her job, she contends that she had sex with Thompson. Thompson would close the door to his office and Byrd would either perform oral sex or have sexual intercourse with Thompson.

According to Byrd, the sexual relationship continued until she complained to Julie Banks in April 2005. When Byrd told Thompson that she did not want to have sex with him, and wanted a working relationship like he had with the other employees, Thompson would respond: "'Do you want to work here?' It would all the time be about my job. There would be times where my son's school would call and I would have to go over to the school and I would ask Mr. Thompson if I can leave and go to my son's school. Mr. Thompson told me I had to perform oral sex on him." Tr. 27.

Byrd estimates that over the past two years, she had oral sex and intercourse with Thompson ten to fifteen times. In the spring of 2005, Byrd states that she was pregnant and decided to have an abortion because she "didn't know if it was my boyfriend's baby or Mr. Thompson's." Tr. 35. When she told Thompson about her pregnancy and that she would need to take time off for doctor's appointments, Thompson said, in the presence of Julie Banks, "You pregnant? Julie, get me a coat hanger out of the closet." Tr. 41.

Over the past year and a half to two years, Thompson "became very aggressive with the harassment." Tr. 25. According to Byrd, Thompson started calling her on her cell phone at night. During the day, when Byrd tried to leave his office Thompson would become upset. In an effort to get away from Thompson, Byrd asked Julie Banks and Johnnie Richardson if she could go out and work in the field with them, but Thompson would not allow it. Tr. 25.

GB 00022

5

According to Byrd, each time her contract was close to expiring Thompson told her that if she did not want her employment to end she would need to have sex with him. Tr. 46. The most recent incident occurred in March 2005. Byrd states that Thompson showed her a letter that indicated her "time was getting ready to expire." Tr. 46. Julie Banks was present when Thompson showed her the letter. According to Byrd, after Banks was no longer in the office, Thompson told Byrd that if she wanted to keep her job she would need to have sex with him. Byrd states that Thompson asked her "What was I going to do to stay there." Byrd contends that she told Thompson that she would not have sex with him anymore. Tr. 46-47. However, because she wanted to keep her job, Byrd states that she had sex with him. Tr. 47.

Byrd testified that Banks told her she had a "feeling that something was going on" at the time Thompson showed her the letter indicating that Byrd's contract was expiring. Tr. 48. Banks told Byrd that she called Thompson after this incident, and he told her that he would not fire Byrd. Tr. 48-49. Afterwards, Banks asked Byrd what was going on, and Byrd confided in Banks about Thompson's treatment of her, leading to the instant complaint.

Finally, Byrd testified about her knowledge of other women who experienced similar treatment from Thompson. Byrd identified four other women whom she believed had been sexually harassed by Thompson: Tonya Kemper, Annette Burns, Demara Gaskins and Marlo Chaney.

According to Byrd, **Tonya Kemper** experienced the same type of treatment from Thompson:

Q    Okay. Tell me what you know about what happened to Ms. Kemper.

A.    When she started he would -- he would call me into his office and he would touch my breasts or feel my behind, and when I would leave out he would call Ms. Kemper in and do the same thing. He has probably touched me on my behind or my breasts or something in front of Ms. Kemper as well as me seeing him touching her.

Q    You've seen Mr. Thompson touch Ms. Kemper inappropriately?

A    Just asking her for a hug, sitting on his lap.

Q    Any comments that you've heard him make to her?

A    (Inaudible.)

Q    Did you discuss Mr. Thompson's treatment with Ms. Kemper? And what was your understanding of how she felt about Mr. Thompson's treatment?

GB 00023

6

A    We both thought Mr. Thompson was disgusting and we talked about making a report on him, but I told Ms. Kemper that I was afraid because I heard other people that did, he did the same thing to, and they got fired and they didn't do anything for them. They did not investigate the claims, they did not do anything. And I was afraid that if we did we would both be fired too.

Byrd further testified that, after Kemper did finally complain about Thompson's treatment, Thompson became extremely angry and threatened to kill Ms. Kemper:

Q.    Mr. Thompson told you he wanted someone to kill Ms. Kemper?

A    Yes.

Q    Do you –

A    And he showed me a gun when he said this.

Q    Where did he have a gun?

A    At work.

Q    Did he say anything else?

A    He would just constantly talk about how he wanted somebody to do something to Ms. Kemper. I guess he would say it in front of me so that I would be scared. And then he would say, "What you going to do now. You going to snitch on me too?"

Tr. 31.

Byrd testified that another co-worker, **Demara Gaskin**, was also sexually harassed by Thompson:

Q    What other employees did you tell about Mr. Thompson's treatment of you?

A    Her name is Demara Gaskins. She also was working there. He fired her as well and she told me that he had kissed her in the mouth.

Q    When did Ms. Gaskins work there?

A    She just was fired maybe two or three months ago.

Q    Do you remember what her position was?

GB 00024

A     Maintenance worker.

Q     Did she work at that same building?

A     Yes.

Q     And what did she tell you?

A     When she was fired it was -- I believe it was because her temporary appointment had expired and Mr. Thompson I guess promised her that he would get her back on. And once he did I guess he told her to come down there and meet with him, and after that she had called -- she had called down there for some reason at the job and I answered the phone and she was talking to me.

She was like, "Can I tell you something?"

And I was like, "You know, sure."

She said, "When I came down there that day to pick up my key," she was like, "Darnell kissed me on my mouth."

Q     Did she say anything else?

A     She said that he had been calling her as well on her cell phone.

Q     Did you tell her anything?

A     I told her to tell the people, call headquarters.

Q     Did you tell her that he had done anything to you?

A     Yes.

Q     Yes?

A     Uh-huh. Yes, at that -- when she told me that, yes, I did. I didn't tell her what, but just that he was harassing me.

Q     And this -- she told you this approximately when?

A     I guess a month ago.

Tr. 72-73

GB 00025

8

Byrd testified that her friend, **Marlo Chaney**, asked Thompson to help her get a job with the Department in the summer of 2004. According to Byrd, Thompson told Chaney that "he would get her a job if she would have sex with him." Tr. 69.

Finally, Byrd alleged that she was told that Thompson sexually harassed **Annette Burns**. Tr. 29. Burns was no longer working at the Department when Byrd started there, so she never spoke to Burns herself about the harassment.

## B. Testimony from Witnesses

### 1.    Julie Banks

Julie Banks is the Maintenance Supervisor at the Half Street location. She has worked at the Department for 23 years and in the Maintenance Division for 18 years. She was interviewed on June 1, 2005.

Darnell Thompson was Banks' supervisor for five years, and she has known him for about 16 or 17 years. Tr. 13. They do not socialize outside of work. Tr. 14. Banks testified that she did not get to know Byrd until the last year or so. Tr. 8. Banks does not socialize with Byrd outside of work, or talk with her about non-work matters. Tr. 10.

Banks testified that it appeared that Thompson and Byrd got along, although he frequently criticized Byrd's work performance. Tr. 12-13. In the past month or two, Banks noticed that Thompson was treating Byrd with hostility. Banks recalls that Thompson's behavior towards Byrd seemed to change after a meeting with the Union where concerns were raised about Thompson's treatment of employees and his relationship with Byrd. Tr. 26. Banks testified that Thompson was "very abrasive" with Byrd. Tr. 26.

Banks stated that she suspected something was going on between Byrd and Thompson because "[w]hen I would go out of the office, when I wanted – when I needed to go out she would always want to go with me and he would tell her that she couldn't go. . . And then there was times when he would tell her that, you know, she was stupid and . . . just make comments about the way she thinks, and the way she reasons, and stuff like that." Tr. 29-30.

Banks also recalled a time when she, Byrd and Thompson were sitting in Thompson's office and the issue of Byrd's pregnancy came up. Banks quoted Thompson as saying to Byrd: "If – if you want to have an abortion just come here and lay on the table and give me a coat hanger." Tr. 28. Banks told Thompson that his comment was inappropriate and left his office.

After hearing Thompson make the comment about an abortion to Byrd, Banks initiated a conversation with Byrd about what was going on between them. Although

9

GB 00026



Byrd was "real reluctant" to tell Banks, she "finally did." Tr. 30. The following is an excerpt from Bank's testimony on what Byrd told her:

Q       What did she say had gone on?

A       Oh, that he -- that he had been having sex with her in the office.

Q       What else did she say?

A       She said that he calls her just about every evening on her cell phone or at home. You said that they had never gone out on a date or anything, so anytime they were together it was in the office. She told me that he was always sending me out of the office so that they could there alone. He wanted to make sure that I was gone, you know, all day so that they wouldn't have any interruptions.

        She had told me that he in fact did buy her car. Actually he gave her the money to purchase the car, but that I think he was going to buy it because he had given her a copy of his driver's license, pay stubs and everything to take out to the dealer. So she had copies of those items.

        She told me that's it been going on for like over a year and that she was really, you know, she was really scared of him. She told me that she thought he was really sick and perverted and that -- to the point that she would never let her child go around him, you know.

        She was just -- you know, she really felt like he needed some serious help and that I just didn't know how serious, you know, it was. And she asked me not to tell anybody.

Q       Why?

A       I'm not really sure why. I'm not really sure why. But after I had thought about it that evening, at home the next morning when I saw her I really told her she needed to report it, you know, because I told her that, you know, I've heard a lot of rumors, you know, and he gave -- made it seem like these people were just making these accusations against him because they were terminated from their positions and so nothing had been, you know, done about it and that she really needed to, really come forward with it, you know, to put an end to it. Because I told her that, you know, I believed everything that she said because I just felt like if, you know, after all this time if people had been saying those things about him then obviously some of it had to be true. And so she needed to deal with it. And so on that very day I sent her up to our human resources, you know, to deal with it.

GB 00027

Q    Did what she was saying to you seem credible, you believed what she was saying?

A    Yeah, I believe what she was saying.

Q    Why do you think -- did she say why she had sex with Mr. Thompson?

A    Yeah, she did. She said -- she said -- "Well, you know where I come from," is what she said. "You know that I'm" -- you know, was welfare to work program is what she was in originally and the job was temporary, and she didn't know how long she was going to have it, and because he kept threatening her that she would lose her job if she didn't that that's why she had sex with him.

And she said he would constantly -- and he did threaten her a lot with the job, and of course I didn't know why but, you know, he was always threatening to fire her.

Q    You heard him --

A    Yes.

Q    -- threaten to fire her?

A    Yes, several times.

Q    So it seemed clear to you that the reason she was having sex with him was because she was afraid she would lose her job?

A    Yes.

Q    Is there any question in your mind that she willingly consented to this relationship or that -- or was it pretty clear that she felt threatened for her job and that's why?

A    Yeah. I really think she felt threatened by her job and that's why she did it. Because I asked her how did it start and she told me that when she was working with one of the crews something had happened on the truck that day and she didn't want to go out with him anymore, and so she came and told Mr. Thompson that she had a problem and she really wanted to work in the office, that she had some clerical skills and she wanted to work in the office. And she said he told her that if she would show him her breasts that he would let her work in the office. And so she said she did. And I guess from that point on she was in the office.

* * * * *

11

GB 00028



Q    Getting back to what Ms. Byrd told you, can you remember anything else about what she said Mr. Thompson did to her?

A    Well, you want me to be graphic, specific? I mean, because -- whew. I had to tell her don't tell me nothing. Well, she said there would be times in the office, she said she didn't understand how I couldn't walk in and see but they would have had -- you know, she would have had oral sex with him. She said there was times when I would come into the office and he'll be sitting behind his desk with his pants unzipped, and because I never ventured basically past his desk I wouldn't see any of that. But I think that was -- that's basically (inaudible).

Q    I understand this is a little awkward for you and I appreciate that it may not be comfortable for you to talk about this.

A    Uh-huh. I mean, she said things -- you know, they had sex on the sofa. I mean, it was always in the office so –

Q    What was her demeanor when she was telling you this, do you remember?

A    She seemed a little, you know, embarrassed, you know, reserved. She was crying when she told me, you know. You know, she was concerned about me, you know, feeling -- looking down at her, you know, putting her down for it and what not.

Tr. 31-37.

    Banks also testified that she tried to "keep her distance" from Thompson herself because "about 15 years ago," Thompson had "approached her inappropriately." Tr. 35. According to Banks, Thompson asked her out on a date and tried to hug her. He "grabbed me and tried to pull me to himself and asked me would I go out with him." Tr. 35.

    Finally, Banks testified that she had heard about other complaints against Thompson, although she did not have any first-hand knowledge of them. Specifically, Banks heard that Annette Burns, Demara Gaskins, and Tonya Kemper all had complained about sexual harassment from Thompson.

**2.    Stanley Dickson**

    Stanley Dickson is the Acting Foreman for the electric shop, the plumbing shop and the HVAC shop. Dickson was interviewed on June 9, 2005.

    Dickson was interviewed because Julie Banks testified that James Gripper told her that Dickson had observed Thompson telling Byrd to sit on his lap and making other

GB 00029



inappropriate comments to Byrd. Banks Tr. at 47. However, in his interview, Dickson denied having ever heard Thompson say or do anything inappropriate or sexual to Byrd or any other woman.

Dickson did testify that about a year and a half ago, a former co-worker, Tonya Kemper, complained to him that Thompson was sexually harassing her. Tr. 10, 12. Dickson stated that Kemper told him that Thompson had "put his hands on her." Tr. 13. In response, Dickson told her he did not want to get involved, and he recommended that she speak with Sylvia Gwathmey, a shop steward in the union. According to Dickson, Kemper was an honest, credible person, and she seemed "upset" when she was talking to him. Tr. 13. Kemper was transferred shortly after she talked to him about her complaint, and he has not had another conversation with her since then. Tr. 15.

### 3.    Leon Harris

Leon Harris, a Landscape Sanitation Supervisor, was interviewed about his knowledge of Byrd's relationship with Thompson, and his conversation with Banks about Dickson's observations. Harris was interviewed on June 9, 2005.

Harris denied any knowledge of Thompson's inappropriate treatment of Byrd specifically, or women in general. He also testified that "you can feel the air in that type stuff. I didn't – it seemed like everything was all right to me, you know, so I didn't pick up on that." Tr. 8. Harris was skeptical that Byrd had experienced anything inappropriate with Thompson: "I didn't see all that stuff being a problem, you know, I mean for as long as she's been down there, she's been working under them conditions, you know, I thought everything was all right . . . I've seen her progress and movement . . . she's advanced . . . one would think everything was all right." Tr. 16.

Harris stated that, although he had heard about Annette Burns' and Tonya Kemper's complaints against Thompson, he had no direct knowledge of them. Tr. 9-10.

### 4.    Deborah Jackson

Deborah Jackson, the current Union President, was interviewed by telephone on June 27, 2005. Jackson refused to be tape-recorded or to provide sworn testimony.

According to Jackson, it was "widely known" that Thompson and Byrd were "going together." Thompson gave Byrd gifts, helped her buy a car, and helped her buy a home. According to Jackson, Byrd "did not worry about nothing because she was going with him." However, Jackson believes that "something must have happened; it [their relationship] wasn't a problem before."

Jackson believes that Byrd was not doing her job, she "did not have any skills," and was "seldom in the office." Byrd was "getting away with things." Other employees resented Byrd's relationship with Thompson: "They knew Garrina was

GB 00030

 

going with Darnell; he was doing this for her, that for her." Then, Byrd "felt she could get something out of it; all of a sudden she's having problems. Well, he's wrong and she's wrong." According to Jackson, Byrd "should not have told about her relationship with him."

Despite Jackson's skepticism about Byrd's complaint, she stated that she felt other women had legitimate claims against Thompson. Although Jackson did not identify these other women by name, she stated "other women did not want these advances and complained; nobody listened." Jackson described one complaint in which a "young girl was pregnant and [Thompson] had her in his office. Darnell bent her backwards and tried to kiss her." As a result, there was a complication in the employee's pregnancy. The employee's father then came and complained to Thompson about his behavior. (From other testimony, it is clear that this employee was Annette Burns.)

Jackson recalled that the coordinator for the Department of Employment Services (DOES) met with Neil Albert (former Deputy Director and Director) about the complaints of sexual harassment from the women in the program. However, nothing was done about it. "Nobody told him they were not going to tolerate this. There were no brakes on him." Thompson "knew people needed a job, and he felt he could use that to make or break them."

### 5.    Sylvia Gwathmey

Sylvia Gwathmey has worked for the Department of Parks and Recreation for over 30 years. She is currently the Site Manager for the Takoma Community Center. Prior to her taking this position, she was a Chief Shop Steward for the Union. On June 29, 2005 Gwathmey was interviewed about sexual harassment complaints she received about Thompson.

Gwathmey does not know Byrd and has no knowledge of Byrd's complaint about Thompson. Tr. 5. However, she received complaints from Annette Burns and Tonya Kemper about sexual harassment from Thompson.

Gwathmey described Burns' complaint as follows:

> Ms. Burns had informed Union that on many occasions, Mr. Thompson would call her to his office and would close the door to speak with her. And Ms. Burns indicated that there was a particular time that Mr. Thompson had pulled her toward him to kiss her. And she indicated, meaning Ms. Burns, that Mr. Thompson stuck his tongue in her mouth and she did not like that and she told him that, according to Ms. Burns. Later, Ms. Burns said that she became very uncomfortable with Mr. Thompson calling her to his office by herself because at that point, the door would close.

GB 00031

14



Ms. Burns also indicated that there were other females that would
hear -- when they heard her say that she had to go to see what Mr.
Thompson wanted, the other females replied to her: don't let him close the
door, you better watch out. I asked Ms. Burns what did she mean by
that, and she also -- she also indicated that there were other females that
were experiencing the same or similar actions. She did not want to share
with me who they were in particular. And so therefore, Union had no
other knowledge specifically as to the other employees.

Tr. 7-8.

Gwathmey recalls that Burns was concerned that she would be fired as a result of
her complaint. And, Gwathmey believes that both Burns and Kemper were, in fact,
fired from the Maintenance Division after they complained about sexual harassment.

Gwathmey testified as follows:

Ms. Kemper was another employee who contacted the union, who was
assigned to Maintenance. Ms. Kemper's conversation with the union was
the fact that this had been going on. The sexual advances that was going
on had been going on for some time. Ms. Kemper indicated that she did
not like that; however, she knew that if she did not comply, according to
Ms. Kemper, that she would not have a job at Maintenance.

Q    Why did she think that? Why did she think if she didn't comply -- and
when you say comply, you mean with Mr. Thompson's demands? Is that
right?

A    That is correct, according to Ms. Kemper.

Q    Okay, and why did Ms. Kemper think she wouldn't have a job if she didn't
go along with Mr. Thompson's requests for sexual favors?

A    That is because Ms. Kemper indicated to me that there were other female
employees who experienced the same or similar situation that are no
longer there because they brought their concerns, I guess, to other
employees and they were let go. And so therefore, they were very careful
of wanting to share it but yet wanting to get help at the same time. And
I cannot remember if in fact that they said it was actually stated to her by a
supervisor that's what would happen.

*    *    *    *

Q    Do you remember what Ms. Kemper said Mr. Thompson did to her or
wanted from her?

15

GB 00032

A    I remember Ms. Kemper indicating that she was often called to Mr. Thompson's office to receive whatever orders for the day or what was -- what needed to be done. And when she would come to the office, the door would then be closed. She also said that Mr. Thompson also on many occasions tried to kiss her. She also indicated that he would play or touch with her breasts.

Q    And did she say if she went along with that, or whether she didn't like it?

A    She -- Ms. Kemper indicated to me that she did not like that, and I do not recall what she said Mr. Thompson said, if he said anything at all. I know that Ms. Kemper met with Union and at that time became very emotional, the fact that what had happened to her and that it went on for some time, that she felt helpless. And so therefore, when she decided she could not take it any longer, she went to someone else, another supervisor.

TR. 12-14.

According to Gwathmey, Kemper complained to her then-supervisor, James Boone. After that, Kemper's contract was not renewed. TR. 15.

Gwathmey recalled that Kemper described another employee who worked in Maintenance who had experienced similar treatment from Thompson. Although Gwathmey does not recall the employee's name, she knew that it was a secretary who worked for Thompson. Gwathmey was sure it was not Joyce Roberts but was the secretary or assistant who sat next to Roberts. TR 18. Thus, by this description, the employee must have been Byrd.

According to Gwathmey, Kemper's impression was that the relationship between the secretary (Byrd) and Thompson was initially voluntary, in that "the lady went along with it, and at a later time she was getting tired of it." TR 17.

When asked whether she believed if Burns' and Kemper's complaints were credible, Gwathmey responded:

At the time of conversation with both ladies, I believed their stories; one, because it was so detailed, and also I asked them to further give me other employees' names and situations that took place in the work place as Union began to do their own internal investigation before both ladies asked that we discontinue.

Q    Did they seem upset about what had happened, or was there anything about their manner that convinced you that they were being truthful?

A    In terms of Ms. Burns, the fact that she was so detailed. And as she continued to share experiences, she became angry, in my opinion, in her

16

GB 00033

 

tone in which the fact that a violation on her person had taken place. I did say, you know, get yourself together and waited a few moments, and then allowed her to continue her conversation.

As Ms. Kemper shared her experiences, eventually indicated that she was ashamed of the fact that what had happened. And eventually as she continued her conversation, started to shake and tremble and began to cry. And this was witnessed by Union, not just myself, but Davora Jackson (phonetic), president of Local 2741.

TR 27-28.

Finally, Gwathmey stated that she thought there might be notes about the complaints from Burns and Kemper, and she would let me know if she was able to locate them.

## 6.    Marlo Chaney

Marlo Chaney was interviewed at the suggestion of Byrd. She was interviewed by telephone on June 30, 2005.

Chaney worked as a Recreational Specialist for the Department of Parks and Recreation in the summer of 2004. Chaney stated that she called Thompson and asked if he knew of any positions she might apply for. Thompson told Chaney to come to his office to discuss it. According to Chaney, when she went to his office:

I filled -- I filled the application out. He and I had a conversation and he asked me what was I willing to do for a job. And I laughed and I said anything -- I'm -- you know, I stated anything. And he stated would I have sex with him? And I laughed about it but he was serious, so we had -- we had sex and he made a call and I got the job.

Q    So you didn't think he was joking when he asked would you have sex with him?

A    I did at first, but he wasn't.

Q    How do you know he wasn't joking? Was there something about his manner, or something that made you realize --

A    It was his manner and the way he was acting.

Q    How was he acting? How would you describe it?

GB 00034

 

A    He was touching on me. He was rubbing on me, grabbing my breast, trying to kiss me.

Q    What did you do when he did all those things?

A    I mean, I was just like -- you know, I just would like laugh at him and try to brush it off, but he was serious. And he stated you want the job? And I was like yeah.

Q    Did it seem to you that if you wanted the job, you had to do what he was asking you to do sexually?

A    I mean basically, yes.

Q    So his words to you were you want the job, like a question?

A    Yeah.

Q    He asked do you want the job?

A    Uh-huh.

Q    And did he ask you that after you said to stop or after you told him you didn't want to do something?

A    He asked me did I want the job before we actually had sex.

Q    So you did actually have sex with him?

A    Yes.

Q    And where was this? Where were you when you had sex with him?

A    In his office.

TR 7-8.

After Chaney had sex with Thompson, she claims that he made a phone call and said he was sending over her application. Chaney recalled that Thompson told whoever he was talking to: "If the bitch miss one day, fire her." TR 12-13.

Chaney testified that Byrd told her about Thompson's treatment of her after her own experience with Thompson:

18

GB 00035



> She told me what Mr. -- what happened with her and Mr. Thompson, and
> I -- then I informed her that, you know, I had slept with him because she
> was real upset when she came -- when I picked her up one day. And I was
> like well, what's wrong, what's wrong. She was crying and everything,
> and I'm like what's wrong, what's going on. And she told me what had
> been going on between her and Mr. Thompson, and she explained to me
> that he had been, you know, asking her for sex and touching on her and
> everything. And I was like oh, my God, I am sorry. And I was like oh,
> my God, you know, I slept with Darnell. And she was like what? And I
> was like yeah, that's how I got the position, the summer position, because I
> slept with him.

Q    And what else did Ms. Byrd tell you about Mr. Thompson?

A    She just said that she was very upset with the fact that every day she'd go
     to work, he's touching on her, he's feeling on her. And then, days that she
     would not go to work or couldn't go to work for some reason, she would
     be scared to go to work the next day, and I always used to wonder why
     until she informed me what was going on.

Q    Okay. How long did Ms. Byrd tell you this had been going on with Mr.
     Thompson?

A    How long did she tell me it was going on?

Q    Yes.

A    For the last, I'll say, four years -- about the last three years.

TR 10-11.

Chaney also testified that Thompson repeatedly called Byrd on her private cell
phone late in the evening, 10:00 or 11:00 at night, over the past year. TR 14-15. When
Thompson called her, Byrd "would be upset. She would be disgusted and just – her
whole – her whole rapport, her whole frame of mind just completely changed." TR 15.

Chaney claimed that Byrd called her crying, complaining about Thompson's
treatment of her. Chaney also testified that she heard Thompson threaten Byrd with her
job and called her "bitches." For example, when Chaney went to pick Byrd up for
lunch, Thompson would tell Byrd "if you're not back in this certain amount of time,
don't come back. And he always just threatened to fire her or something . . . " TR 16.

Finally, Chaney recalled that Thompson gave money to Byrd for a car. Chaney
believes that it was "at least $3000.00" because she went with Byrd to get the car, and
she knew that Byrd did not have the money herself to purchase the car. According to

GB 00036



Chaney, Byrd bought the car with cash that she received from Thompson. Chaney stated that the car is in Byrd's name, and not Thompson's.   TR 23-25.

### 7.    Johnnie Richardson

Johnnie Richardson has been a Work Leader for the past 19 years. She is based at the 1515 Half Street location. Richardson was interviewed on June 29, 2005.

Richardson testified that there are rumors that Byrd and Thompson had a relationship, but she does not know it firsthand. Richardson has not seen Thompson acting inappropriately around Byrd, nor has she heard Byrd complain about Thompson.

Richardson heard one complaint about Thompson from Demara Gaskins about one year ago. She was Gaskins' Work Leader and they were working on a weekend at the Chevy Chase center. Gaskins said: "Ms. Johnnie, Darnell made a pass at me. I said for real? She say yes. . . She didn't say any more." TR 9. Richardson did not take Gaskins' complaint seriously because Gaskins did not file a complaint against Thompson and because "she wasn't saying it serious." TR 10. Richardson states that no one else ever said anything to her about Thompson.

### 8.    James Gripper

James Gripper works at the Facility Support Section, in the Paint Shop as a Crew Leader at the 15151 Half Street location. Gripper was interviewed on June 29, 2005.

Gripper denied knowing anything about Byrd and Thompson's relationship or interactions. Gripper did not provide any details about his conversation with Steven Scott concerning Thompson's behavior which he had allegedly shared with Julie Banks.

Gripper did describe a conversation that he had four or five months ago with Demara Gaskins in which Gaskins described how Thompson had pulled her into a closet. Gripper told Gaskins that he was skeptical that she could have been pulled in against her will – "I said, you must've went in on your own, you know, because once you seen what he was doing, you could've stopped him." TR 8. Gripper then testified that Thompson is a "big man, maybe 6'3", maybe 250, 260" lbs., and Gaskins was about .5'3" and 130 lbs. TR 9-10. Gripper stated that he "didn't see where it was a force issue" because she did not have to stay in the closet with Thompson. TR 11. According to Gripper, Gaskins was recently fired.

GB 00037

( 0                                ( 0

### 9.    Steven Scott

Steven Scott is a plumber who works out of the 1515 Half Street location. Scott was interviewed on June 29, 2005.

Scott denied having told James Gripper about a situation with Thompson that he thought was inappropriate. However, Scott stated that he had "heard that . . . he'll talk to different girls and, you know, if they wanted to stay, you know, he could – he could keep them their job." Scott continued: "You know, like for instance, if their – if their term is up . . . then he could try to get them back, you know, into the Department." TR 7. Scott denied knowing anything about Thompson threatening people with their jobs if they did not have sexual relationships with him. TR 7-8.

Scott stated that Thompson was "just a big, spoiled baby . . . Although he knew he was in charge but he wanted you to know that he was in charge, you know. And he liked to play a lot, you know. That's that just was his thing. He loved playing." TR 10.

### 10.    Joyce Roberts

Joyce Roberts has worked for the Department of Parks and Recreation since 1974. She was Garrina Byrd's former supervisor and still works at the 1515 Half Street location. Roberts was interviewed on July 8, 2005. The transcript from her interview is not yet available. Accordingly, the following is a summary taken from my notes of the interview.

Roberts supervised Byrd from the time she started working in the office. Byrd received her work assignments from Roberts and Roberts filled out Byrd's performance evaluations, which Thompson then reviewed. According to Roberts, Byrd was "not a good employee. It came to a point where she would not do anything. I tried to get her to go to training and she would not go to training." Byrd started coming to work "when she felt like it, if she felt like it."

Roberts stated that the only time Byrd said anything to her about Thompson harassing her was in response to Roberts' question about why she "never did any work." Byrd answered that she did not "feel like she needed to do work" because of everything else she did for Thompson. Roberts told Byrd that she (Byrd) would "need to take that complaint somewhere." However, Roberts stated that she knew Byrd and Thompson were in a "relationship." Roberts observed that Thompson was territorial around Byrd. "If she wanted to talk to any young fellow, if another guy wanted to talk to her, they would have to sneak" around Thompson. Byrd was always "getting everything she wanted; she told people he bought her a car and was paying bills for her."

Roberts denied seeing the door to Thompson's office frequently closed. She states that she talked to Thompson about closing his door before Byrd came to work there, and she told him it was not appropriate to have meetings with the door closed or

GB 00038

 

Thompson denied ever socializing with Byrd outside of work, except that once Byrd invited him to attend a picnic at Ft. Dupont Park with Byrd and her children. This was in the summer of 2003 or 2004. According to Thompson, other members of Byrd's family were there, as well as Marlo Chaney. Thompson stated that the only time he called Byrd after work hours was when he was returning a call from her, or when he needed to talk to her about work issues. Thompson stated that he never went to Byrd's home, or asked her if he could go to her home. Thompson also denied ever asking Byrd to go out of town with him.

Thompson admitted that he did ask Byrd to bring him coffee in the mornings, but denied ever telling Byrd that he wanted "breast milk" with the coffee. Thompson emphatically denied ever asking Byrd to lift her shirt up so he could see her breast, touching Byrd's breast, telling her to sit in his lap, putting his hands under her clothing, telling her to perform oral sex, or having sexual intercourse with Byrd. Thompson forcefully denied ever having any sexual relationship with Byrd.

Thompson admitted that he hugged Byrd. When asked how frequently he hugged her, Thompson said once or twice a week. He then stated that he did not "initiate" these hugs. According to Thompson, "if I'm walking in and you hug me, then you initiated the hug."

In February 2005, Thompson recalled that several employees were going to be terminated, including Harold McKoy, Elba Moore, Warren Cunningham, an employee named Elmore [last name unknown] and Michael [last name unknown]. Byrd was also to be terminated. Thompson recalls that he had decided to terminate Byrd's employment, but thinks that Julie Banks convinced him not to, stating "it was probably some things Banks said to me." Thompson denied telling or suggesting to Byrd that she would need to have sex with him if she wanted to have her contract renewed.

Thompson recalled that Byrd claimed to be pregnant this past spring. Thompson stated that he was aware of "several alleged pregnancies." He admitted that he made a comment, in Banks' presence, suggesting that he would perform an abortion on Byrd with a coat hanger instead of Byrd spending money on an abortion. Thompson testified that he was joking when he said that, and admits that it was an "inappropriate comment."

In response to questions about giving Byrd money to buy a car, Thompson stated that he lent Byrd money several times. According to Thompson, Byrd asked to borrow money a lot, and both he and Banks lent her money between paychecks. Byrd always paid him back the money. The most money Thompson recalls ever lending Byrd was $200.00 sometime around the end of 2004.

Thompson denied helping Byrd to buy a car, although he did recall giving Byrd his driver's license to make a copy of, and agreeing to be a co-signer for a vehicle she was trying to buy in late 2004 or early 2005. Thompson states that he thought the loan was for about $2100.00. When asked why he agreed to co-sign the loan, Thompson

23



stated: "to get her out of my office." Thompson stated that he never signed any papers or saw any paperwork relating to the car.

Thompson was asked about his knowledge of and relationship with Tonya Kemper. In response, Thompson stated that she was clerical assistant who was sleeping on the job. After he told her he was going to terminate her, Kemper complained that he had asked her for sexual favors. Thompson believes that Kemper was trying to keep her job and that is why she complained. Thompson adamantly denied any sexual contact with Kemper, including oral sex, intercourse, or touching her body. He did state that he hugged Kemper four or five times over a two year period.

In response to questions about Annette Burns, Thompson stated that Burns reported to Joyce Roberts, and worked at the Half Street location in 2001 or 2002. According to Thompson, Burns had a class scheduled at the Center for Workforce Development. Thompson received a phone call saying that Burns would have to pay $85.00 for missing a class. When Thompson communicated this information to Burns, she "got up and left the office." The next day, Burns did not come to work, and he got a call from Neil Albert stating that Burns was alleging that Thompson sexually harassed her.

According to Thompson, Burns was pregnant and almost full term. It did not make sense to him that she would claim he would try to force himself on her. Thompson talked to Terrance Reddick and Leo Albinos about the complaint, and ac.... o Thompson, they later informed him that they did not find anything against him. Thompson denied any sexual contact with Burns.

When Thompson was asked about Demara Gaskins he stated that she worked with Custodial Services at the Half Street location. Thompson decided to terminate Ga... in January or February of 2005 because she was not coming to work. She was given several verbal warnings, and Julie Banks also thought that Gaskins should be terminated. Thompson denied any sexual contact with Gaskins, although he did say that he hugged her.

When asked about Marlo Chaney, Thompson stated that she was Byrd's friend and she came to the office throughout 2003 and 2004 to see Byrd. Thompson admitted talking to Chaney about getting her a job for the summer of 2004. He told her that she could not work in Maintenance because "she and Byrd were real close." According to Thompson, he "helped her get a job at a daycare center." Thompson gave her an application to fill out. Thompson then faxed the application to the daycare office and asked them to consider her. Thompson recalls talking to Brenda Galloway about Chaney's application, and asking Galloway to consider Chaney.

Thompson adamantly denied asking Chaney for sex or sexual favors in exchange for helping her with the job application. He also denied having any sexual contact with Chaney of any type at any time.

GB 00040

24

 

# RECOMMENDATIONS

## A.    Sexual Harassment Defined

Sexual harassment is defined both under the Mayor's Order on Sexual Harassment (October 20, 2004) and in caselaw as:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when any one of the following criteria is present:
>
> a.    Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;
>
> b.    submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting the individual; or
>
> c.    such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

There are two main types of sexual harassment: "Quid Pro Quo" and "Hostile Environment." Quid pro quo harassment occurs when a supervisor offers or denies employment benefits in exchange for sexual favors. The offer may either be clearly stated, or suggested by words or conduct.

In quid pro quo harassment, the harasser is always a supervisor or some other person with the ability to affect an employee's work situation. It is quid pro quo sexual harassment if the subordinate employee had a reasonable fear that rejecting the harasser's unwelcome advances would affect his/her employment.   It is sexual harassment even if the harasser does not actually say that the employee's job is at stake. And, it is sexual harassment even if the employee gives in to unwelcome sexual advances.

Hostile environment sexual harassment occurs when an uncomfortable  work environment is created by sexual behavior in the workplace. The sexual behavior must be so bad that it affects an employee's ability to do his or her job.  To be sexual harassment, the behavior in question must be sexual, not just mean, unfair or offensive. A hostile environment is usually based on  repeated sexual conduct that goes on for a long period of time. Occasionally it is based on a single, severe incident or event, such as attempts to kiss or touching of private parts.

In the instant complaint, Garrina Byrd's complaint raises both quid pro quo and hostile environment claims of sexual harassment.  And, if her testimony is believed, the

GB 00041

conduct about which she complains unquestionably rises to the level of both forms of harassment.

## B.    Recommended Findings

Because Byrd and Thompson's accounts conflict in every important respect -- Thompson vehemently denies virtually all of Byrd's allegations -- a recommendation on whether harassment actually occurred requires credibility determinations. Accordingly, it is important to review the testimony that corroborates Byrd's claims and weigh that evidence against potential conflicts or inconsistencies in her story. In addition, while I have not been able to interview Tonya Kemper, Annette Burns or Demara Gaskins to date, there is corroborating testimony from other witnesses that these three women had complaints similar to Byrd's.

### 1.    Corroborating Evidence of Byrd's Allegations

Julie Banks provided significant corroboration of Byrd's claims. She confirmed: (1) that Byrd repeatedly requested to go out in the field with her but Thompson would not allow it; (2) Thompson's manner with Byrd was abrasive and hostile; (3) Thompson told Banks he was not going to renew Byrd's contract but then inexplicably did renew it; (4) Byrd did not come forward with her complaint until Banks prodded her to do so, and when Byrd reluctantly confided in Banks, Banks found her to be credible. Finally, Banks confirmed that Thompson made an offensive and inappropriate comment to Byrd about performing an abortion on her in his office.

Banks was an extremely credible witness. In addition, she has no apparent bias for either Thompson or Byrd. She testified that she had a good working relationship with both of them, and that Byrd thought that she was close to Thompson and was afraid to confide in her for that reason. Accordingly, Banks' testimony should be considered highly reliable.

Other facts corroborating Byrd's claims include the circumstances under which her contract was renewed this past spring and the fact that she complained after the contract was renewed. It is Byrd's contention that Thompson told her that having sex with him was the only way she could keep her job, and that after she acceded to his demands her contract was renewed. This allegation is supported by the fact that Byrd was slated for termination, but at the last minute Thompson renewed her contract. The fact that Byrd disclosed Thompson's harassment after her contract was renewed suggests that she did not have a motive to fabricate the story; her job was already safe.

It is also noteworthy that while the other witnesses denied any first-hand knowledge of a sexual relationship between Byrd and Thompson (other than Marlo Chaney), many of them were under the impression that there was, indeed, some relationship between them. And, although Chaney is a close friend of Byrd's and her testimony must be viewed with some skepticism, her recollection of Byrd's story closely resembles Julie Banks' testimony on this score. Moreover, Joyce Roberts --

GB 00042

who by her own admission does not like Byrd -- did recall that Byrd told her that she was involved sexually with Thompson, albeit indirectly.

Finally, Thompson's own testimony corroborates several of Byrd's claims and casts doubt on his denials of a relationship with Byrd. Thompson admitted: (1) making the inappropriate comment about giving Byrd an abortion; (2) giving Byrd his driver's license and co-signing for Byrd's car; and (3) hugging Byrd once or twice a week, and then unconvincingly stating that Byrd initiated these hugs. Thompson's explanation for terminating Byrd's contract and then deciding to renew it also did not ring true. Although Thompson testified that it was probably some things that Banks said to him that convinced him to keep Byrd on, Banks stated that she had encouraged him to terminate Byrd since he was complaining so much about her.

This is not to suggest that there questions do not remain about Byrd's story; there are inconsistencies that should be probed, if possible. For example, Byrd testified that she "told everybody that he touched me. I told everybody that he was a pervert. Anybody that would talk to me at work I told them about what he did, what he does to me." TR 16. This testimony seems at odds with her testimony about not wanting to say anything to Julie Banks about Thompson's treatment. In addition, none of the witnesses I interviewed who worked at the Half Street location claimed to have knowledge of Byrd's complaints.

In addition, Byrd did not mention in her testimony that Thompson had helped her to purchase a car. While this point does not have any real bearing on her claims for sexual harassment, it does suggest that her relationship with Thompson might have been consensual at some point.

Finally, Thompson stated that Byrd invited him to picnic with her children either in the summer of 2003 or 2004 -- well after the harassment is alleged to have started. If true, this could call into question Byrd's claims that she had an unwelcome sexual relationship with Thompson.

2.    Corroborating Evidence of Other Complaints Against Thompson

As noted above, the fact that Tonya Kemper complained about Thompson's treatment was verified by both Stan Dickson and Sylvia Gwathmey. And, the type of behaviors that she reported to the Union closely mirrored Byrd's allegations, i.e., Thompson threatened Kemper that if she did not comply with his request for sexual favors she would lose her job, and Thompson would close the door to his office and sexually assault her. Gwathmey provided a detailed description of Kemper's complaint and testified that she found Kemper to be credible.

Two witnesses also recalled that Demara Gaskins complained about harassment from Thompson: Johnnie Richardson stated that Gaskins told her Thompson made a pass at her, and James Gripper recalled that Gaskins told him that Thompson had pulled her into a closet against her will. While both Richardson and Gripper seemed skeptical

GB 00043

that Gaskins had actually been harassed, they both clearly remembered Gaskins sharing this information about Thompson's behavior.

Both Sylvia Gwathmey and Deborah Jackson recalled Annette Burns' complaint about Thompson's behavior. Again, Gwathmey provided a detailed summary of Burns' complaint and stated that she found it credible. In addition, although he was not formally interviewed as part of this investigation, Terrence Reddick, Labor Relations Coordinator, informed me on July 14, 2005 that Annette Burns spoke to both him and Neil Rogers, former Chief of Staff, about Thompson. According to Reddick, three or four years ago, Burns complained that Thompson was asking for sexual favors and threatening her job if she did not comply. Reddick stated that there was no investigation into Burns' claims because she did not want to file an official complaint.

### 3.    Recommended Action

Although the investigation is not yet complete, I believe that based on the factual record developed thus far there is enough evidence to find that Byrd's complaint is credible. At a minimum, Thompson engaged in conduct inappropriate for a supervisor. Under the Mayor's Order on Sexual Harassment, upon a finding of sexual harassment an agency "shall recommend appropriate disciplinary action, up to and including termination of any employee." Given the severity of the behavior at issue, Thompson's termination would seem to be the appropriate disciplinary action in this case. It is my view that termination would be in the best interest of the efficiency of the Department and in the interest of the safety of its employees.

Finally, it should be noted that both Union and management officials, including the Labor Relations Coordinator, seemed to be under the impression that if an employee did not want to file a formal complaint of sexual harassment, no further action was required by the Department. However, once an employer is on notice of a claim of sexual harassment, it is obligated to take prompt remedial action regardless of whether the employee wants to pursue a "formal" complaint. Accordingly, it is important that the Department take appropriate action at this time both to remedy prior problems and to prevent any further sexual harassment in the Department.

Among my recommendations are (1) the development and Department-wide dissemination of detailed, Department-specific policies on sexual harassment, including procedures for supervisors to follow once they are on notice of a claim and options for employees who witness or are subjected to harassment; and (2) the development of a comprehensive sexual harassment prevention training program; and (3) separate training sessions for supervisors/managers and employees on preventing and identifying sexual harassment, as well as Department policies and procedures.

GB 00044